EDWARD M. GERGOSIAN (105679)
ROBERT J. GRALEWSKI, JR. (196410)
CLARISSA E. RILEY (239628)
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 237-9500
Facsimile: (619) 237-9555

CAREY & DANIS, LLC
MICHAEL J. FLANNERY (SBN: 196266)
8235 Forsyth, Suite 1100
St. Louis, MO 63105
Telephone: (314) 725-7700
Facsimile: (314) 721-0905

Attorneys for Plaintiff Kenneth Fox Supply Co.

FILED
'07 NOV 13 AM 10:35
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH FOX SUPPLY CO., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARKANSAS BEST CORPORATION, AVERITT EXPRESS, INC., CON-WAY INC., FEDEX CORPORATION, JEVIC TRANSPORTATION, INC., SUN CAPITAL PARTNERS IV, LLC, NEW ENGLAND MOTOR FREIGHT, INC., OLD DOMINION FREIGHT LINE, INC., R+L CARRIERS, INC., SAIA, INC., UNITED PARCEL SERVICE, INC., and YRC WORLDWIDE INC.,<br><br>Defendants. | Case No. '07 CV 2166 BTM (POR)<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff Kenneth Fox Supply Co. ("Plaintiff" or "Fox Supply"), on behalf of itself and those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants, demands a trial by jury and based upon information and belief and the investigation of counsel, except for information based on personal knowledge, alleges as follows:

## NATURE OF THE ACTION

1.  Beginning June 2003 or earlier, and continuing into the present, the Defendant trucking companies have conspired to fix "fuel surcharges" for less-than-truckload truck shipments ("LTL"). Pursuant to Rules 23(a), 23(b) and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks treble damages, injunctive relief, attorneys' fees and costs under the antitrust laws of the United States on behalf of themselves and all others similarly situated.

2.  This action is instituted under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Classes (defined herein) by reason of the violations, as hereinafter alleged, of § 1 of the Sherman Act, 15 U.S.C. § 1.

3.  This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of § 1 of the Sherman Act, as hereinafter alleged.

## JURISDICTION AND VENUE

4.  This Court has diversity jurisdiction over the Classes pursuant to 28 U.S.C. § 1332(d)(2) and (6) because one or more members of the Classes defined herein are citizens of a State different from one or more of the Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

5.  Jurisdiction is further conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6.  Venue is found in this district pursuant to §§ 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d). Venue is proper in this judicial district because during the Class Period one or more of the Defendants resided, transacted

business, was found, or had agents in this district and a substantial portion of the affected interstate trade and commerce described below has been carried out in, this district.

7. Defendants maintain offices, have agents, transact business, or are found within this judicial district.

8. This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business in the United States; (b) directly sold substantial quantities of LTL services throughout the United States; (c) had substantial aggregate contacts with the United States as a whole; and/or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this district. Further jurisdictional facts as to certain foreign Defendants are alleged below.

## DEFINITIONS

9. As used herein, the term:

   a. "LTL," short for "less-than-truckload," means the service of providing freight shipment, for carriage by truck, when the freight to be shipped by a customer is less than one truckload;

   b. "Person" means any individual, partnership, corporation, association or other business or legal entity; and

   c. "Class Period refers to the period from at least July 30, 2003, through the conclusion of the trial in this matter.

10. Plaintiff brings this action on behalf of itself and the members of the Damages Class comprising:

> All persons or entities who paid a "fuel surcharge" on LTL service directly to Defendants or their unnamed co-conspirators from July 30, 2003 through the conclusion of the trial in this matter. Excluded from the Class are federal government entities, the Defendants, their co-conspirators and their respective parents, subsidiaries and affiliates Period" refers to the period from at least July 30, 2003, through the conclusion of the trial in this matter.

11. Plaintiff further brings this action on behalf of itself and the members of the Injunctive Relief Class comprising:

All persons or entities who purchased LTL services directly or indirectly from Defendants or their unnamed co-conspirators., Excluded from the Class are federal government entities, the Defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

12    The market definition in this action is the market for LTL service for shipments wholly within North America and originating and/or terminating in the United States. LTL shipments nearly always weigh between 300 and 10,000 lbs. Excluded from this market definition are the markets for shipments requiring at least one full truck, small package shipments, shipment of furniture and personal effects by persons moving from one house to another, intermodal shipments, and shipments for carriage by air, water, or train.

## PARTIES

13.    Plaintiff Kenneth Fox Supply Company is a Texas corporation with its principal place of business in McAllen, Texas at 2200 Fox Drive, McAllen, Texas 78504. Plaintiff is a McAllen, Texas-based provider of packaging, primarily in the fresh produce industry. Plaintiff purchased LTL services directly from one or more of the Defendants, including, but not limited to, FedEx Corporation during the Class Period, and paid a collusively set and imposed "fuel surcharge." The prices that Fox Supply paid for LTL services were greater than they would have been absent the conspiracy herein alleged resulting in injury to Fox Supply's business and property.

14.    Defendant Arkansas Best Corporation ("ABF") is a trucking conglomerate incorporated in Delaware offering LTL services under a variety of business names and wholly-owned alter-ego subsidiaries, including ABF, ABF Freight System, Inc., ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc. ABF's headquarters are at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

15.    Defendant Averitt Express, Inc. ("AE") is a privately-held LTL company incorporated in Tennessee with most of its operations concentrated in the southeastern United States, and additional operations in selected cities outside this region, such as Long Beach, California. AE's headquarters are at Perimeter Place One, 1415 Neal Streef, Cookeville, Tennessee 38502.

16. Defendant Con-way Inc. ("CW") provides LTL service, as well as truckload brokerage, airfreight forwarding, region asset based truckload service, transportation consulting, and assembly and distribution logistics programs for business-to-business supply cycle management. CW is incorporated in Delaware and has its headquarters at 2855 Campus Drive, Suite 300, San Mateo, California 94403.

17. Defendant FedEx Corporation ("FedEx") provides packaging shipping and freight services, including LTL service, and operates FedEx Kinko's, among other business lines. FedEx is a Delaware corporation with its principal place of business in California. FedEx's headquarters are located at 942 South Shady Grove Road, Memphis, Tennessee 38120.

18. Defendant Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation and major regional LTL services provider focusing on the Northeastern United States. Jevic's headquarters are located at 600-700 Creek Road, Delanco, New Jersey 08075.

19. Defendant Sun Capital Partners IV, LLC ("Sun") is a private equityfund incorporated in Delaware that purchases companies in leveraged buyouts, or LBOs. Sun purchased Defendant Jevic from Defendant Saia, Inc. on or about July 5, 2006, shares equitable ownership with Jevic and as part of and subsequent to the leveraged buyout extracted so much equity from Jevic that the company currently does not have assets sufficient to pay the fullclaims of the Damages Class. Sun's headquarters are located at 5200 Town Center Circle, Suite 470, Boca Raton, Florida 33486.

20. Defendant New England Motor Freight, Inc. ("NEMF") is a regional LTL company incorporated in New Jersey providing service in the Northeastern United States, Eastern Canada, and Puerto Rico. NEMF's headquarters are located at 1-71 North Avenue East, Elizabeth, New Jersey 07201.

21. Defendant Old Dominion Freight Line, Inc. ("ODFL") is a Virginia corporation that derives most of its business from LTL service. ODFL's headquarters are located at 500 Old Dominion Way, Thomasville, North Carolina 27360.

22. Defendant R+L Carriers, Inc. ("RLC") is a privately-held LTL company, incorporated in Ohio, with operations in 45 states, Canada, and Puerto Rico. RLC operates

under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount Transportation. RLC's headquarters are located at 600 Gillam Road, Wilmington, Ohio 45177.

23. Defendant Saia, Inc. ("Saia") is an LTL company incorporated in Delaware with annual revenues exceeding $875 million. Saia's headquarters are located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097.

24. Defendant United Parcel Service, Inc. ("UPS") is a freight, package delivery, and supply chain management company incorporated in Delaware. UPS's headquarters are located at 55 Glenlake Parkway, NE, Atlanta, Georgia 30328. UPS entered the LTL market by acquiring the assets of Overnite Transportation Company, then one of the largest LTL companies operating in the United States.

25. Defendant YRC Worldwide Inc. ("YRC") is a large trucking company incorporated in Delaware providing LTL service and other freight services using its own name and several other brands. YRC's headquarters are located at 10990 Roe Avenue, Overland Park, Kansas 66211.

## CO-CONSPIRTORS

26. Various corporations and individuals not named as defendants in this Complaint participated as co-conspirators in the anti-competitive conduct alleged herein and performed acts and made statements in furtherance thereof.

## FACTUAL ALLEGATIONS

27. LTL services are used by Plaintiff and members of the Classes as a means to transport freight within North America by ground. Plaintiff estimates, based on articles in trucking industry trade journals, total domestic LTL industry revenue ranged from $25 to $35 billion annually during the Class Period.

28. A number of structural characteristics of the LTL industry facilitate the implementation and maintenance of horizontal price-fixing:

    a. LTL services are a commodity product that are fungible in the sense that LTL services provided by any Defendant are substitutable for the LTL services provided by any

other Defendant. LTL services are homogenous services sold by Defendants and purchased by Plaintiff and members of the Class primarily on the basis of price;

      b.    Demand for LTL services is imperfectly inelastic, meaning the gains from collusion are substantial;

      c.    The LTL service' industry in the United States is highly concentrated, facilitating coordination of prices. During the Class Period, Defendants possessed a combined United States market share exceeding 75%;

      d.    There are substantial barriers to entry in the LTL industry requiring substantial time, resources, and industry knowledge to even potentially overcome. Viable entry requires the purchase or lease of hundreds of trucks and dozens of truck depots. Similarly, viable entry requires that a new provider capture a significant market share from existing providers. Thus, entry is both expensive and risky. Entry is further restricted by the tight labor market for truck drivers. Current market participants face significant driver shortages. A potential competitor's entry into the market also would require significant advertising expenses in order to build a recognized brand name;

      e.    Even for potential shipping experts who possess the capital and know how to possibly enter the market, viable entry takes a long time. When package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded existing LTL companies rather than attempting to enter the market directly;

      f.    LTL services are a nondurable product. Unlike some industries, shippers cannot "stock up" on LTL service when prices are low and use this stockpile when shipping prices are high;

      g.    The cartel members all sell at the retail level of distribution as horizontal competitors;

      h.    Price is the most important competitive factor in LTL shipping, and the standardized nature of LTL shipping services hinders substantial and material non-price competition;

   i. The firms have a similar cost structure. In the LTL industry there is a high ratio of fixed to variable costs. Capital equipment, software, advertising, depot purchase or lease, driver recruitment and training, and other capital costs are high relative to variable costs. None of the defendants are greatly more efficient than the industry average;

   j. Newer industries are typically characterized by rapid growth, innovation, and high profits. The LTL industry is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude

   k. The industry has a history of "cooperation." For example, several regional LTL companies have formed alliances with other regional LTL companies, with the claimed purpose of allowing nationwide service, but in fact with many more companies than would be required to offer such services. The level of cooperation within the trucking industry is higher than in similar industries, and has created a level of trust within the industry that has facilitated Defendants' collusion;

   l. The LTL industry has become increasingly concentrated. For example, in 2003 Defendant YRC, then operating under the names Yellow, Freight System and Yellow Transportation, merged with Roadway, then one of the largest LTL companies. The combined Yellow/Roadway entity then merged in 2005 with USF, another major LTL company, further increasing LTL market concentration;

   m. Defendants are able to match each others' prices through publication of prices, and because Defendants frequently use identical pricing software; and

   n. During discussions of mergers and sales of assets from one Defendant to another, Defendants exchange non-public competitively sensitive financial information, periodically allowing them to audit and gauge their co-conspirators' compliance in imposing supracompetitive "fuel surcharges."

  29. Fuel cost is the single substantial variable Defendants must cover that is subject to wide variation in price. When a company's variable costs increase, without a concomitant offsetting increase in demand, the profits of the company will decrease as the company can only pass on a portion of the cost increase to its customers.

30. Beginning in 2003, Defendants, facing drastically increased fuel costs and the likelihood of lower profits, have evaded this basic economic law by collusively imposing on their customers what are claimed to be "fuel surcharges," but which in fact bear little relation to the increase in their fuel costs. Higher fuel costs in fact were merely the pretext and an opportunity for Defendants to agree among themselves to impose collusive "fuel surcharges."

31. Observers of the LTL industry, and indeed some of the Defendants themselves, have noted the direct relationship between high fuel prices and LTL profits. By way of example:

a. A 2006 article in *Traffic World*, a weekly trade publication covering the transportation and logistics industry, quoted Ken Hazen, president of transportation software and freight payment firm CTSI, as describing fuel surcharges as "'a profit center now . . . . Carriers are in control. They're in the catbird seat.'"

b. A transportation industry analyst at Bear Stems noted that: "'Our sense is that generally the LTL carriers make money on fuel surcharges and that earnings for LTL providers would be hurt by sustained lower fuel costs.'"

c. A 2005 article in *Fleet Owner*, a trade magazine for executives and managers of commercial trucking fleets, noted that in the past increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices: "High diesel fuel prices usually signal harsh times for trucking. . . . That doesn't seem to be the case this year."

d. Defendant ODFL frankly admitted in its 2006 annual report that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability: "A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes."[1]

e. Defendant YRC also made this admission: "In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term."

---

[1] All further citations to statements by Defendants and by companies in other industries being compared to Defendants, unless otherwise noted, come from their respective 2006 annual reports.

f.  Defendant ABF made a similar admission:

> As diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted.

32.  These admissions are in marked contrast to the domestic passenger airline industry. For example, Southwest Airlines noted:

> The cost of fuel, which was at an historically high level over the last two years, is largely unpredictable and has a significant impact on the Company's results of operations . . . .
>
> Due to the competitive nature of the airline industry, the Company's ability to increase fares is limited . . . .

33.  United Airlines made the same observation:

> At times, United has not been able to increase its fares when fuel prices have risen due to the highly competitive nature of the airline industry, and it may not be able to do so in the future . . . .
>
> * * *
>
> Higher fuel costs have had a significantly adverse effect on the Company's operating expenses in 2006 as compared to 2005.

34.  On December 15, 2004, the *International Herald Tribune* published an article headlined "Fuel costs wipe out airline profit despite travel rebound." The article noted:

> The airline industry is experiencing huge growth worldwide, in a recovery from several rough years after the Sept. 11, 2001, terrorist attacks and regional problems like severe acute respiratory syndrome, or SARS. But the escalation in fuel prices produced another huge loss for the industry this year . . . .

## OPERATION OF THE PRICE-FIXING CARTEL

35.  When fuel prices began increasing in the early 2000s, LTL companies began imposing increasingly high "fuel surcharges." These "fuel surcharges" were not set by the rate-setting organizations, and thus are beyond the scope of their former limited antitrust immunity.

36.  Defendants agreed to impose identical or nearly identical "fuel surcharges" by agreeing to tie the "fuel surcharges" to an index of diesel fuel prices published to the public by the United States Department of Energy ("Fuel Index"). Further, in order to communicate movement of prices and to police the cartel, each of the Defendants lists its fuel surcharges on their Web

sites. As a result, Defendants' "fuel surcharges" move in lockstep, as illustrated in the following chart showing the fuel surcharges of each Defendant at different Fuel Index levels:

| Diesel Fuel $/Gallon | ABF | AE | CW | FedEx Freight | Jevic | ODFL | RLC | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9% | 18.9% | 19.0% | 18.5% | 18.9% | 18.9% | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9% | 20.9% | 20.9% | 21.0% | 20.5% | 20.9% | 20.9% | 20.9% | 20.9% |
| 3.20 | 22.9% | 22.9% | 22.9% | 21.9% | 23.0% | 22.5% | 21.9% | 22.9% | 22.9% | 22.9% |
| 3.40 | 24.9% | 24.9% | 24.9% | 22.9% | 25.0% | 24.5% | 22.9% | 24.9% | 24.9% | 24.9% |
| 3.60 | 26.9% | 26.9% | 26.9% | 23.9% | 27.0% | 26.5% | 23.9% | 26.9% | 26.9% | 26.9% |

37.  Recently the Fuel Index was near $3.00. At that price, Defendants charged a "fuel surcharge" of 20.5%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, and 21.0%.

38.  The amount of the "fuel surcharge" imposed by the LTL companies on shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the increase in fuel prices since the "fuel surcharge" was imposed.

39.  For example, FedEx noted that for FedEx Freight's, LTL service: "While fuel costs increased substantially in 2006, fuel surcharges more than offset the effect of higher fuel costs . . . ." Similarly, CW states: "As fuel prices have risen, the fuel surcharge has increased Conway Freight's yields and revenue, and Con-way Freight has more than recovered higher fuel costs and fuel-related increases in purchased transportation."

## EFFECTS

40.  The unlawful contract, combination or conspiracy alleged above had, *inter alia*, the following effects:

a.  Prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Classes for LTL services were maintained at artificially high and noncompetitive levels; and

   b.   Plaintiff and members of the Classes were required to pay more for LTL services than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing.

   41.   During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiff and members of the Damages Class directly purchased LTL services in the United States.

   42.   Plaintiff and the other Damages Class members paid more for the LTL than they would have paid under conditions of free and open competition.

   43.   As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Damages Class were injured and financially damaged in their businesses and property, in amounts that are not presently determinable but in excess of the amount necessary for the jurisdiction of this Court.

## CLASS ACTION ALLEGATIONS

   44.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

   45.   Plaintiff brings this action on its own behalf and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Classes.

   46.   Plaintiff believes the members of the Classes number in the thousands, the exact number and identities being known only by Defendants.

   47.   The members of the Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

   48.   There are questions of law and fact common to the Classes. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof. These questions include, without limitation:

   a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize fuel surcharges imposed for LTL services sold in the United States;

   b.   The identity of participants in the conspiracy;

c. The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated § 1 of the Sherman Act;

e. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Classes;

f. The effect of Defendants' conspiracy on the prices of LTL services sold in the United States during the Class Period; and

g. The appropriate measure of damages sustained by Plaintiff and other members of the Damages Class.

49. Plaintiff is a member of both Classes. Plaintiff's claims are typical of the claims of other members of the Classes, and Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff paid "fuel surcharges" for LTL services directly to Defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Classes. In addition, Plaintiff is represented by competent counsel experienced in the prosecution of antitrust and class action litigation.

50. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

51. Defendants have acted, and refused to act, on grounds generally applicable to the Injunctive Relief Class, thereby making appropriate final injunctive relief with respect to this entire Class.

52. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

53. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable from records in the files of

Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Classes who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I
### (Violation of Sherman Act, 15 U.S.C. § 1)

54. Plaintiff realleges and incorporates each and every allegation set forth above as if fully written herein.

55. From a date unknown, but at least from July 30, 2003, and continuing through the present, Defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of 15 U.S.C. § 1.

56. In furtherance of the unlawful conspiracy, upon information and belief, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

    a. agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of fuel surcharges of LTL services sold in the United States;

    b. communicating with co-conspirators regarding prices to be charged for LTL "fuel surcharge" services;

    c. meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein; and

    d. refraining from competition by refusing to offer fuel surcharges and LTL services at prices below the agreed-upon fixed price.

57. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of fuel surcharges on LTL services.

58. Defendants' anti-competitive agreement was implemented by, *inter alia,* instituting surcharges calculated by reference to publicly published indices. These coordinated price increases continued on a regular basis through the present, with the actual and intended result that Plaintiff and members of the Classes paid supracompetitive prices for fuel surcharges on LTL services. Defendants falsely attributed these price increases to the cost of fuel. As a direct and proximate result of the fuel surcharges on LTL price-fixing conspiracy, Defendants have restrained competition in the LTL market and injured Plaintiff and each Damages Class member in their business and property in that they have each paid a higher price for fuel surcharges on LTL services than they would have paid absent the concerted unlawful activity.

59. The conduct of Defendants and their co-conspirators constitutes a per se violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

60. In the alternative, the conduct of Defendants and their co-conspirators is a rule of reason violation of § 1 of the Sherman Act, 15 U.S.C. § 1, given that there is no legitimate business or pro-competitive justification for the actions complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A. The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given members of the Class;

B. The Court adjudge and decree that the contract, combination and conspiracy alleged herein is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C. Judgment be entered against Defendants, jointly and severally, in favor of Plaintiff and the Class for treble damages determined to have been sustained by them by virtue of Defendants' violations of the Sherman Act, as allowed by law; and

D. Defendants and their co-conspirators, and their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors,

1 | agents and employees, and all other persons acting or claiming to act on behalf of Defendants or
2 | their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in
3 | any manner, directly or indirectly, continuing, maintaining or renewing the combinations,
4 | conspiracy, agreement, understanding or concert of action, or adopting any practice, plan,
5 | program or design having a similar purpose or effect in restraining competition;

      E.    The Court award Plaintiff and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

      F.    The Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: November 13, 2007

Respectfully submitted by:

GERGOSIAN & GRALEWSKI LLP
Edward M. Gergosian
Robert J. Gralewski, Jr.
Clarissa E. Riley

_____
Robert J. Gralewski, Jr.

655 West Broadway, Suite 1410
San Diego, CA 92101

CAREY & DANIS LLC
Michael J. Flannery
8235 Forsyth, Suite 1100
St. Louis, MO 63105

*Attorneys for Plaintiff Kenneth Fox Supply Co.*

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS<br>KENNETH FOX SUPPLY CO., on behalf of itself and all others similarly situated, | DEFENDANTS  FILED<br>ARKANSAS BEST CORPORATION, AVERITT EXPRESS, INC., CON-WAY INC., FEDEX CORPORATION, JEVIC TRANSPORTATION, INC., SUN CAPITAL PARTNERS IV, LLC, NEW ENGLAND MOTOR FREIGHT, INC., OLD DOMINION FREIGHT LINE, INC., R+L CARRIERS, INC., SAIA, INC., UNITED PARCEL SERVICE, INC., and YRC WORLDWIDE INC. |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    McAllen, TX<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Robert J. Gralewski, Jr.<br>GERGOSIAN & GRALEWSKI LLP<br>655 West Broadway, Suite 1410<br>San Diego, CA 92101<br>(619) 237-9500 | ATTORNEYS (IF KNOWN)<br><br>07 CV 2166 BTM (POR) |

**II. BASIS OF JURISDICTION** (PLACE AN X IN ONE BOX ONLY)

- 1 U.S. Government Plaintiff
- **X** 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX (For Diversity Cases Only)   FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | •1 | •1 | Incorporated or Principal Place of Business in This State | •4 | •4 |
| Citizen of Another State | •2 | •2 | Incorporated and Principal Place of Business in Another State | •5 | •5 |
| Citizen or Subject of a Foreign Country | •3 | •3 | Foreign Nation | •5 | •6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. §15). Plaintiff brings this antitrust class action alleging the Defendant companies conspired to fix, raise, maintain and stabilize prices of fuel charges added to their customers' bills.

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| • 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | • 610 Agriculture | • 422 Appeal 28 USC 158 | • 110 400 State Reappointment |
| • 120 Marine | • 310 Airplane | • 362 Personal Injury-Medical Malpractice | • 620 Other Food & Drug | • 423 Withdrawal 28 USC 157 | **X** 10 Antitrust |
| • 130 Miller Act | • 315 Airplane Product Liability | • 365 Personal Injury-Product Liability | • 625 Drug Related Seizure of Property 21 USC881 | PROPERTY RIGHTS | • 430 Banks and Banking |
| • 140 Negotiable Instrument | • 320 Assault, Libel & Slander | | • 630 Liquor Laws | • 820 Copyrights | • 450 Commerce/ICC Rates/etc. |
| • 150 Recovery of Overpayment & Enforcement of Judgment | • 330 Federal Employers' Liability | • 368 Asbestos Personal Injury Product Liability | • 640 RR & Truck | • 830 Patent | • 460 Deportation |
| • 151 Medicare Act | • 340 Marine | PERSONAL PROPERTY | • 650 Airline Regs | • 840 Trademark | • 470 Racketeer Influenced and Corrupt Organizations |
| • 152 Recovery of Defaulted Student Loans (Excl. Veterans) | • 345 Marine Product Liability | • 370 Other Fraud | • 660 Occupational Safety/Health | SOCIAL SECURITY<br>• 861 HIA (13958) | • 810 Selective Service |
| • 153 Recovery of Overpayment of Veterans Benefits | • 350 Motor Vehicle | • 371 Truth in Lending | • 690 Other | • 862 Black Lung (923) | • 850 Securities/Commodities Exchange |
| • 160 Stockholders Suits | • 355 Motor Vehicle Product Liability | • 380 Other Personal Property Damage | LABOR<br>• 710 Fair Labor Standards Act | • 863 DIWC/DIWW (405(g))<br>• 864 SSID Title XVI | • 875 Customer Challenge 12 USC |
| • 190 Other Contract | • 360 Other Personal Injury | • 385 Property Damage Product Liability | • 720 Labor/Mgmt. Relations | • 865 RSI (405(G)) | • 891 Agricultural Acts |
| • 195 Contract Product Liability | | | • 730 Labor/Mgmt. Reporting & Disclosure Act | FEDERAL TAX SUITS<br>• 870 Taxes (U.S. Plaintiff of Defendant) | • 892 Economic Stabilization Act<br>• 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | • 740 Railway Labor Act | • 871 IRS – Third Party 26 USC 7609 | • 894 Energy Allocation Act<br>• Freedom of Information Act |
| • 210 Land Condemnation | • 441 Voting | • 510 Motions to Vacate Sentence Habeas Corpus | • 790 Other Labor Litigation | | • 900 Appeal of Fee Determination Under Equal Access to Justice |
| • 220 Foreclosure | • 442 Employment | | • 791 Empl. Ret. Inc. Security Act | | |
| • 230 Rent Lease & Ejectment | • 443 Housing/Accommodations | • 530 General | | | • 950 Constitutionality of State |
| • 240 Tort to Land | • Welfare | • 535 Death Penalty | | | • 890 Other Statutory Actions |
| • 245 Tort to Product Liability | • Other Civil Rights | • 540 Mandamus & Other | | | |
| • 290 All Other Real Property | | • 550 Civil Rights | | | |
| | | • 555 Prisoner Conditions | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

**X** 1 Original Proceeding   • 2 Removal from State Court   • 3 Remanded from Appelate Court   • 4 Reinstated or Reopened   • 5 Transferred from another district (specify)   • 6 Multidistrict Litigation   • 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** **X** CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:   JURY DEMAND: **X** YES   • NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions): JUDGE _____ Docket Number _____

DATE November 13, 2007   SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PA10 $350 11/13/07 BH RCPT# 144409

```
           UNITED STATES
           DISTRICT COURT
        SOUTHERN DISTRICT OF CALIFORNIA
              SAN DIEGO DIVISION

        #  144409      -  BH

        November 13, 2007
             10:31:48

           Civ Fil Non-Pris
   USAO #.: 07CV2166 CIVIL FILING
   Judge..: BARRY T MOSKOWITZ
   Amount.:              $350.00 CK
   Check#.: BC# 5720



   Total-> $350.00


   FROM: KENNETH FOX SUPPLY V.
         ARKANSAS BEST CORP.
         CIVIL FILING
```